IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Terrell J. Woodley, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Jo Anne B. Barnhart, )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>) | Civil Action No. 6:04-22228-SB-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. Sections 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was no longer entitled to supplemental security income benefits ("SSI").

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff, a minor child at the time, was found eligible for SSI commencing January 1, 1993, due to attention deficit hyperactivity disorder ("ADHD"), based on an application filed January 14, 2003. When the plaintiff turned 18 on June 19, 1997, the claim was reevaluated and it was determined that his condition had improved and that he no

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

longer had marked and/or severe functional limitations. Disability was determined to have ceased on August 1, 1997, and eligibility for benefits was terminated at the end of October 1997.

The plaintiff's mother requested reconsideration of the decision, which was denied on June 14, 1999. She then filed a timely request for hearing, which was held on February 10, 2000. Following the hearing, at which the plaintiff, his mother, and another witness appeared, the administrative law judge considered the case *de novo*, and on June 26, 2000, determined that the plaintiff was not entitled to benefits, as he could perform medium work which did not involve continuous use of his left hand. The plaintiff sought review of this decision, and on December 6, 2001, the Appeals Council vacated the hearing decision and remanded the case for further evaluation of the plaintiff's physical and mental impairments and for evidence from a vocational expert.

Following a supplemental hearing was held on March 13, 2002, at which the plaintiff, his attorney, his mother, and a vocational expert appeared, the administrative law judge determined that the plaintiff's disability had ceased on August 1, 1997, and his eligibility for benefits had properly ended in October 1997. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on July 10, 2004.

In making the determination that the plaintiff was no longer entitled to benefits, the ALJ made the following findings:

> (1) The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (2) The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).
>
> (3) These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(4) The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

(5) The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

(6) The claimant has the residual functional capacity to perform occasional lifting up to 50 pounds and frequent lifting of 25 pounds. He has a moderate limitation of grip in the left hand and strength in the left hand is 3 out of 5. He should work in a relatively low stress setting where he would not have to deal with the general public or relate extensively with others.

(7) The claimant has no past relevant work (20 CFR § 416.965).

(8) The claimant is a 'younger individual' (20 CFR § 416.963).

(9) The claimant has 'a limited education' (20 CFR § 416.964).

(10) The claimant has the residual functional capacity to perform a significant range of medium work (20 CFR § 416.967).

(11) Although the claimant's exertional limitations do not allow him to perform the full range of medium work, using Medical-Vocational Rule 203.25 as a framework for decision-making, there are a significant number of jobs in the national economy that he could performs. Examples of such jobs include work as flag man/signaler (1000 in SC and 40,000-50,000 in US), inspector, grader, sorter (1400 in SC and 60,000-70,000 in US), and cleaner/housekeeper, cleaner II, and sweeper/cleaner (16,000 in SC and 80,000 in US).

(12) The claimant's disability was properly ceased on August 1, 1997.

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff

can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The record reveals that the plaintiff was 23 years old on the date of the Commissioner's final decision (Tr. 65). He completed the ninth grade in special education classes and has no past relevant work experience (Tr. 41-42).

On August 12, 1997, Cashton B. Spivey, Ph.D., evaluated the plaintiff at the request of the Commissioner. Dr. Spivey noted that the plaintiff had never been hospitalized for any physical or mental problem and had been taking Ritalin for ADHD but that he had not taken Ritalin on the day of the evaluation. The plaintiff denied symptoms of depression or psychosis, reported normal sleep and energy level, and complained of problems with attention/concentration. He reported a history of cruelty to animals and an arrest for assault. He indicated he could read a newspaper and perform simple arithmetic calculations. Dr. Spivey found the plaintiff had borderline intellectual functioning with a verbal IQ of 73, a performance IQ of 73, and a full scale IQ of 72. Dr. Spivey noted that, statistically, the chances are 95 out of 100 that the plaintiff's true full scale IQ falls in the range of 67 to 77. He noted that the plaintiff displayed no weakness in immediate visual memory, which he found to be inconsistent with ADHD. He also found that the plaintiff read and performed arithmetic at a fifth-grade level. Dr. Spivey concluded that the plaintiff had borderline intelligence and was developing antisocial personality traits. He stated that the plaintiff would continue to benefit from special education classes and hopefully would be able to be a successful member of the work force in the future. Dr. Spivey also stated that the plaintiff was better suited for manual labor than verbal or arithmetic tasks (Tr. 232-34).

On August 18, 1997, Dr. John Aycock examined the plaintiff at the request of the Commissioner. Dr. Aycock found the plaintiff had a flexion-tendon injury of the ring finger of the left hand which could be surgically corrected and no other physical abnormalities (Tr. 215-18).

On August 21, 1997, Dr. Herbert Gorod completed a Psychiatric Review Technique Form ("PRTF") regarding the plaintiff at the request of the Commissioner, based on a review of the plaintiff's records. Dr. Gorod reported that the plaintiff's borderline intellectual functioning and antisocial personality disorder caused "moderate" limitations in activities of daily living, social functioning, and concentration, and had "once or twice" resulted in episodes of decompensation in work-like settings (Tr. 219-27). In an accompanying Mental Residual Functional Capacity Assessment, Dr. Gorod reported that the plaintiff had no significant limitations in most areas of work-related mental functioning, and "moderate" limitations in understanding, remembering, and carrying out detailed instructions; in accepting instructions, and in responding appropriately to criticism from supervisors (Tr. 228-30).

On February 25, 1999, Dr. James W. Folk, Jr., examined the plaintiff at the request of the Commissioner. The plaintiff complained of back pain resulting from being struck by a truck in September 1998, for which he was taking Motrin, and of an inability to extend his left ring finger. He plaintiff stated that he spent his time exercising, walking around, and playing basketball and that he did some household chores and yard work. He reported that he had recently completed a GED program but had not yet taken the test due to lack of funds. Dr. Folk found the plaintiff was fully oriented and had fair memory, limited general information, below-average counting, calculating, and digit-recall abilities, absent insight, moderately-impaired judgment, and low-average intellectual functioning. He found the plaintiff capable of interacting socially, concentrating, and understanding and responding appropriately. Dr. Folk reported diagnoses of ADHD (by history) and antisocial personality traits and a GAF of 65.[2] He stated that while the plaintiff had a history of

---

[2] A Global Assessment of Functioning (GAF) code between 61 and 70 indicates 2 "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 1994).

7

ADHD, "presently the concern would be more his personality deficits and the need for some structure in his life." He noted that the plaintiff was not currently involved in any productive activity and recommended a referral to the Department of Vocational Rehabilitation. Dr. Folk concluded that the plaintiff was "quite capable of doing some type of manual labor" (Tr. 261-64).

On March 16, 1999, Lisa Smith-Klohn, Ph.D., completed a Psychiatric Review Technique Form (PRTF) regarding the plaintiff at the request of the Commissioner, based on a review of the plaintiff's records. Dr. Smith-Klohn reported that the plaintiff's ADHD, borderline intellectual functioning, and antisocial personality disorder caused "moderate" limitations in activities of daily living and social functioning, "often" caused deficiencies of concentration, and "never" resulted in episodes of deterioration or decompensation in work-like settings (Tr. 269-77). In an accompanying Mental Residual Functional Capacity Assessment, Dr. Smith-Klohn reported that the plaintiff had no significant limitations in most areas of work-related mental functioning and moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and attention for extended periods (Tr. 265-67).

On April 29, 1999, Dr. Richard Weymuth assessed the plaintiff's Physical Residual Functional Capacity at the request of the Commissioner, based on a review of the plaintiff's records. Dr. Weymuth concluded that the plaintiff did not have a "severe" physical impairment[3] (Tr. 279-87).

On December 20, 1999, an orthopedist at the Medical University of South Carolina found the plaintiff had decreased grip strength in the left hand and problems with flexion and contraction in the fingers of the left hand, particularly the ring finger, due to a previous injury (Tr. 254).

---

[3]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.921(a) (2004).

8

At the hearing on February 10, 2000, the plaintiff testified that he left school in the tenth grade (Tr. 27). He stated that he attempted to work as a dishwasher in a pizza shop and that the job ended after one day because his hand hurt (Tr. 28). He testified that his left hand was weak and that it sometimes started "jumping" for no apparent reason (Tr. 30). He testified that he experienced pain in his right leg when walking (Tr. 31). He stated that he could read "a little bit" and could write (Tr. 29).

On March 14, 2000, Dr. Craig Harris examined the plaintiff in relation to complaints of injuries sustained in a motor vehicle accident. The plaintiff complained of headaches, dizziness, insomnia, neck pain, upper back pain, mid-back pain, low back pain, and left hand and wrist pain. Dr. Harris found the plaintiff had normal strength in the upper and lower extremities, decreased range of motion of the lumbar spine, muscle spasms in the cervical region, and decreased grip strength in the left hand. He noted an assessment of cervicogenic cephalgia, cervical strain/sprain, thoracic strain/sprain, lumbar strain/sprain, and exacerbation of pre-existing hand injury. Dr. Harris recommended medication for inflammation and pain (Tr. 342-44).

The plaintiff returned to Dr. Harris on an unspecified date, complaining of severe back and left hand pain. His neurological examination was unremarkable. Dr. Harris recommended continued conservative treatment and an MRI scan (Tr. 344-45).

On October 14, 2001, the plaintiff presented at Care Alliance Health Services with complaints of headaches and of pain in the right knee and mid-back following a motor vehicle accident. An impression of contusion of the right knee and back strain was rendered (Tr. 346-54).

On January 10, 2002, the plaintiff returned to Care Alliance Health Services complaining of back pain since October 2001. The plaintiff related that he had taken no medication to attempt to relieve his pain. An impression of chronic low back pain was noted (Tr. 357-63).

At the hearing on March 13, 2002, the plaintiff testified that he attended school through the tenth grade and that he had tried to work in a pizza shop but was fired after two hours (Tr. 41-42). He testified that he had enrolled in a GED class but never completed it and never obtained a GED (Tr. 42-43). He stated that he was unable to grip anything with his left hand and that he experienced intermittent back pain, mostly at night (Tr. 43). He testified that he did "not really" know how to read (Tr. 44-45).

Hermina Woodley, the plaintiff's mother, testified that the plaintiff did not complete household chores he started, could not understand instructions, and could not successfully buy items on a shopping list (Tr. 47-49). She testified that his only activities were watching television and listening to the radio (Tr. 47-48). She stated that he was impatient and quick to become angry (Tr. 50-52). She testified that he no longer took Ritalin and that aspirin was his only medication (Tr. 52).

The ALJ asked Mark Meadows, Ed.D., a vocational expert, to consider a person of the plaintiff's age and educational background who read at a fourth-grade level, was illiterate "in terms of Social Security rules," could perform "medium work," had a full scale IQ of 72, had a flexion-contraction problem with his left ring finger, and had moderately limited grip strength in his left hand (Tr. 53-54). Dr. Meadows testified that such a person could work as a flag man/signaler, inspector/grader/sorter, and cleaner/housekeeper (Tr. 55-56). He also testified that if the same individual were restricted to low-stress work, he could perform those jobs (Tr. 57-58).

## **ANALYSIS**

As noted above, after a supplemental hearing, the ALJ determined that the plaintiff's disability had ceased on August 1, 1997, and his eligibility for benefits had properly ended in October 1997. The plaintiff alleges that the ALJ erred by (1) misrepresenting the evidence from Drs. Spivey, Folk, and Gorod; (2) failing to find the

10

plaintiff met the listings for mental retardation and personality disorders; (3) failing to accurately portray the plaintiff's limitations in the hypothetical question to the vocational expert; (4) failing to reconcile the vocational expert's testimony with the Dictionary of Occupational Titles ("DOT"); and (5) failing to properly assess the plaintiff's credibility and failing to credit the testimony of his witness.[4]

The plaintiff first argues that the ALJ misrepresented the evidence from Drs. Spivey, Folk, and Gorod. Specifically, he argues that the ALJ took selective portions of medical evidence out of context and cited it as conclusions by the doctors that the plaintiff had the capacity to perform work related activities. However, viewing the evidence from these doctors as a whole, this court agrees with the defendant that the ALJ properly analyzed the doctors' reports.

Dr. Spivey, who evaluated the plaintiff at the request of the Commissioner in 1997, stated in his report that the plaintiff had borderline general intelligence with satisfactory visual-motor functioning and significant academic deficits. He noted that the plaintiff would benefit from participation in special education classes that would help him develop his academic achievement skills. He further noted that the plaintiff "appears to be an individual who hopefully will eventually be capable of successfully joining the work force. He would be an individual who would perform better at manual labor tasks as opposed to tasks that would challenge his verbal or arithmetic skills" (Tr. 234).

Two years later, Dr. Folk, who also examined the plaintiff at the request of the Commissioner, noted in his report that the plaintiff had been in a special education class, but left that class to go to night school. He completed the GED program and passed the pre-GED test after a couple of tries, but he had not yet raised the money to take the GED test (Tr. 261-63). Dr. Folk noted that the plaintiff did not demonstrate evidence of a major

---

[4]The plaintiff filed his original brief *pro se*. In that brief, he stated that he was "disabled mentally and physically" and was "suffering from chemical imbalance in the brain." He later retained counsel, who filed a reply brief raising the cited errors in the ALJ's decision.

11

psychiatric or mental disorder. The main concern was his "personality deficits and the need for some structure in his life. He is capable of interacting socially and certainly during the interview appeared to concentrate, to understand and to respond appropriately." Dr. Folk stated that, in his opinion, the plaintiff was "quite capable of doing some type of manual labor and if he is successful with the GED, may be appropriate for some more specific training program" (Tr. 263-64).

Dr. Gorod reported that the plaintiff's borderline intellectual functioning and antisocial personality disorder caused "moderate" limitations in activities of daily living, social functioning, and concentration, and had "once or twice" resulted in episodes of decompensation in work-like settings (Tr. 219-27). In an accompanying Mental Residual Functional Capacity Assessment, Dr. Gorod reported that the plaintiff had no significant limitations in most areas of work-related mental functioning, and "moderate" limitations in understanding, remembering, and carrying out detailed instructions; and in accepting instructions. The findings of the above-cited doctors are consistent with the ALJ's assessment of the plaintiff's limitations. Accordingly, the ALJ did not err in this regard.

The plaintiff next argues that the ALJ erred in failing to find the plaintiff met the Listing of Impairments under 20 C.F.R. Appendix 1, Subpart P, Listing 12.05(C). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. §404.1520(d).

Section 12.05 is the listing related to mental retardation. Mental retardation refers to "a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period [before age 22]." 20 C.F.R. Part 404, Subpt. P, App. 1, §12.05. Further, "[t]he required level of security for this disorder is met when the requirements of A, B, C, or D are satisfied." *Id.* A claimant is to be found disabled under Listing 12.05(C) if he or she has the following: "A valid verbal, performance,

12

or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Id.*

As set forth above, Dr. Spivey noted in his report that the plaintiff had a verbal IQ of 73, a performance IQ of 73, and a full scale IQ of 72, based upon his performance on the WAIS-R. Dr. Spivey further noted that, statistically, the chances were 95 out of 100 that the plaintiff's true full scale IQ fell in the range of 67 to 77 (Tr. 233). The plaintiff argues that the ALJ was legally obligated to use the score of 67 in determining whether the plaintiff met this listing (pl. brief 3). However, the case cited by the plaintiff in support of this argument is not on point. In *Kennedy v. Heckler*, 739 F.2d 168, 172 (4th Cir. 1984), the claimant had a full scale IQ of 72, a verbal IQ of 79, and a performance IQ of 65. The Fourth Circuit reversed and remanded for award of benefits in part because the ALJ failed to use the claimant's lowest score (65) in conjunction with Listing 12.05. In this case, unlike the claimant in *Kennedy*, there is no evidence that the plaintiff has a "valid, verbal, performance, or full scale IQ of 60 through 70" as required by the listing.

The plaintiff also cites the listing for personality disorders (pl. reply brief 3), which provides as follows:

> 12.08 Personality Disorders: A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:
> 1. Seclusiveness or autistic thinking; or
> 2. Pathologically inappropriate suspiciousness or hostility; or
> 3. Oddities of thought, perception, speech and behavior; or
> 4. Persistent disturbances of mood or affect; or
> 5. Pathological dependence, passivity, or aggressivity; or
> 6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

>    And
>
>    B. Resulting in at least two of the following:
>    1. Marked restriction of activities of daily living; or
>    2. Marked difficulties in maintaining social functioning; or
>    3. Marked difficulties in maintaining concentration, persistence, or pace; or
>    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. App. 1, Subpt. P, Listing 12.08. Assuming that the plaintiff meets the requirements of Part A of Listing 12.08, there is no evidence that he meets the requirements of Part B. Accordingly, the ALJ did not err in failing to find the plaintiff met these listings.

Next, the plaintiff argues that the ALJ failed to accurately portray the plaintiff's limitations in the hypothetical question to the vocational expert and failed to reconcile the vocational expert's testimony with the Dictionary of Occupational Titles ("DOT"). The Fourth Circuit Court of Appeals has held that "[i]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The questions, however, need only reflect those impairments that are supported by the record. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3rd Cir. 1987). The purpose of a vocational expert's testimony is to assist in determining whether jobs exist in the economy which a particular claimant could perform. *Id.* The ALJ, however, has great latitude in posing hypothetical questions and is free to accept or reject suggested restrictions, so long as there is substantial evidence to support the ultimate question. *See Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1986).

As set forth above, the ALJ asked the vocational expert to consider a person of the plaintiff's age and educational background who read at a fourth-grade level, was illiterate "in terms of Social Security rules," could perform "medium work," had a full scale

IQ of 72, had a flexion-contraction problem with his left ring finger, and had moderately limited grip strength in his left hand (Tr. 53-54). The expert testified that such a person could work as a flag man/signaler, inspector/grader/sorter, and cleaner/housekeeper (Tr. 55-56). He also testified that if the same individual were restricted to low-stress work, he could perform those jobs (Tr. 57-58). The plaintiff argues that the hypothetical did not take into account the plaintiff's "longstanding and medically documented history of anti-social, hostile, and impulsive behavior" (pl. reply brief 4). At the hearing, the plaintiff's attorney asked the vocational expert to assume that the hypothetical person had difficulty carrying out instructions and maintaining attention and concentration, a "tendency toward impulsive behavior that [could] also become violent behavior," and required more than a normal degree of supervision in order to keep him on task" (Tr. 59).

The expert responded that the need for special supervision would require that such a person work in employment that is sheltered, which was not the case with the positions he identified. He testified that if the person could only concentrate for two and a half hours during an eight-hour work day, the work he described could not be performed. However, if the person could stay on task for two and a half hours, take a break, and then go back to the task, the work could be performed. If the person "expressed openly hostility toward supervisors and co-workers," the person would not be able to perform the work identified by the vocational expert (Tr. 59-60).

The attorney's hypothetical overstates the plaintiff's impairments. However, it does appear that the plaintiff's antisocial personality traits and his moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and attention for extended periods should have been included in the hypothetical. Accordingly, remand is necessary.

The plaintiff further argues that the ALJ failed to reconcile the vocational expert testimony that was contrary to the DOT (pl. reply brief 4). Specifically, the ALJ noted

that the plaintiff was illiterate and capable of only one- and two-step processes (Tr. 17, 54). Under the criteria of the DOT, such limitations constitute an R-1 reasoning level (pl. reply brief 4). However, the positions listed by the vocational expert required a reasoning level of R-2 or above (Tr. 374-77).

> Social Security Ruling 00-4p provides in pertinent part:
>
> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, *3.

The ALJ did not obtain testimony from the vocational expert to explain why the plaintiff would be able to perform these jobs. Based upon the foregoing, upon remand, the ALJ should obtain testimony to explain this apparent conflict.

Lastly, the plaintiff argues the ALJ failed to properly assess his credibility. A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7 states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make

16

clear to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p.

The ALJ found that the plaintiff's testimony concerning his limitations was not totally credible (Tr. 19). The ALJ considered the factors listed in Social Security Ruling 96-7p[5] in determining that the extent of the pain alleged by the plaintiff was not reasonably consistent with the evidence. Specifically, he stated:

> The claimant is not seeing any physician on a regular basis for any chronic condition. He is not taking any prescribed medications, and he takes over-the-counter analgesics for relief of back pain. He is not taking the type of pain medication associated with severe back pain.
>
> The claimant has full range of motion of the upper and lower extremities, except for the flexion contracture of his left ring finger, which one physician indicated could be corrected with surgery.
>
> He described some daily activities when he was evaluated by Dr. Folk, including yard work and household chores. He said that he enjoyed playing basketball.
>
> The claimant's description of daily activities is representative of a fairly active and varied lifestyle and is not indicative of a significant restriction of activities or constriction of interests.
> ***
> No physician has opined that the claimant cannot perform substantial gainful activity, and no physician is seeing the claimant on a regular basis. There are few treatment records since 1997.

---

[5] In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:
 1. The individual's daily activities;
 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
 3. Factors that precipitate and aggravate the symptoms;
 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.
SSR 96-7p, 1996 WL 374186, *3.

17

> The testimony of the claimant is not fully credible concerning the severity of his symptoms and the extent of his limitations. neither the severity nor the extent is supported by the objective medical evidence of record. The evidence does not show strength deficits, circulatory compromise, neurological deficits, muscle spasms, atrophy or change in weight which are reliable indicators of long-standing, severe or intense pain, physical inactivity or depression.
>
> Given the claimant's daily activities; lack of frequent emergency room visits or hospitalization for pain; the lack of prescribed pain medication; the lack of alternative treatment modalities for pain; and the lack of treatment by any physician on a regular basis, I find that the claimant's allegations are not credible.

(Tr. 16-17).

The plaintiff takes exception with the defendant's argument that the plaintiff presented conflicting testimony on the subject of his prior work attempt (def. brief 13). The plaintiff argues that the defendant "has extracted out of context two of Plaintiff's statements which he made at two different hearings in response to two totally different questions by two different ALJs" (pl. reply brief 6). This court agrees with the plaintiff. However, it does not appear that the ALJ considered this issue in assessing the plaintiff's credibility. Accordingly, the issue is moot. The plaintiff also argues that the ALJ had a duty to consider and expressly evaluate the testimony of the plaintiff's witness, his mother, which he failed to do (pl. brief 6). Accordingly, upon remand the ALJ must consider and evaluate the testimony of the plaintiff's witness and set forth his reasons for not crediting her testimony. *See Young v. Barnhart*, 284 F. Supp.2d 343, 355 (4th Cir. 2003).

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

January 9, 2006

Greenville, South Carolina